IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| Jennifer J. BANDURCHIN,      Plaintiff | : : : | |
| v. | : : | CIVIL NO. L-06-842 |
| STAPLES THE OFFICE SUPERSTORE EAST, INC.,      Defendant | : : : | |

### MEMORANDUM

Now pending is the Motion for Summary Judgment as to Liability filed by Jennifer J. Bandurchin, and the Motion for Summary Judgment filed by Defendant Staples the Superstore East, Inc. Because the issues presented are clear, no hearing is necessary. See Local Rule 105.6 (D. Md. 2004). For the following reasons the Court will, by separate Order, DENY the motions.

**I.   INTRODUCTION**

This is a wrongful termination suit. Plaintiff Jennifer J. Bandurchin ("Bandurchin") formerly worked for Defendant Staples the Office Superstore East, Inc. ("Staples") as the Operations Manager of its store in Owings Mills, Maryland. The Owings Mills store, like all Staples stores, contains a UPS shipping center. In late 2004, Bandurchin began to suspect two male customers of using the center to ship packages of stolen electronics. She reported her suspicions to other members of management. Dissatisfied with their inaction, Bandurchin filed a report with the Baltimore County Police Department that included biographical information about one of the men and documents she obtained from Staples that described his history of shipments. She also

1

provided a Best Buy store with limited information about the men and one of the packages that he shipped. When these disclosures came to light, Staples terminated Bandurchin for disclosing customer information without proper approval. This suit followed. The parties cross-moved for summary judgment.

Maryland courts have held that an employer is liable for wrongful discharge when it terminates an employee for reporting a suspected crime to the police. Maryland's wrongful termination doctrine protects Bandurchin's act of reporting her suspicions to the police. This doctrine, however, does not protect Bandurchin's disclosures to Best Buy.

There is no support in the record for the proposition that Staples terminated Bandurchin solely for disclosing customer information to Best Buy. This leaves two possible alternatives. Either Staples fired her solely for reporting her suspicions to the police, in which case it would be liable for wrongful discharge. Or, Staples terminated her for both disclosures, in which case the outcome is unclear. Counsel have not briefed the standard to be applied in a mixed-motives case.

The Court finds that there is a genuine issue of material fact concerning Staples's actual reason for firing Bandurchin. A trial is, therefore, necessary to decide this question. Counsel will be requested to brief the mixed-motives standard in the pretrial order.

## II.     BACKGROUND

The facts of this case are largely undisputed. On August 6, 1998, Staples, an office supply store chain, hired Jennifer Bandurchin as a cashier. Bandurchin eventually attained management-level positions at Staples. In September 2004, Staples transferred Bandurchin to its store in Owings Mills, Maryland. While at the Owings Mills store,

Bandurchin worked as the Operations Manager and then as Sales Manager.[1] As Sales Manager, Bandurchin oversaw the UPS shipping center, which customers use to mail letters and packages.[2]

In October or November 2004, Bandurchin noticed that "multiple times a week" two men would bring in "multiple boxes" of "high-end electronics" to ship. Once or twice the men brought in a box that weighed twenty to thirty pounds. Although they valued the package at $1,500, they labeled its contents as "shoes." Bandurchin began to suspect that the men were shipping stolen goods.

On one occasion, the men brought in a Bose-brand "electronic system" with a fluorescent Best Buy sticker on it. Bandurchin noted that the sticker referenced the store number of a Best Buy in Timonium, Maryland.

In November 2004, Bandurchin relayed her concerns to her then-General Manager, John Bernardo. Bernardo told her to keep an eye on the situation and, if she saw fit, to contact Scott DeFrancesco, the Loss Prevention Manager for that Staples "district."

At some point in late 2004, Bandurchin called DeFrancesco. DeFrancesco was unconcerned about Bandurchin's suspicions. DeFrancesco did not investigate the matter because the items, if stolen, had not been stolen from Staples.

---

[1]   At some point, Bandurchin then returned back to the Operations Manager position. The parties do not address how long she served as Sales Manager.

[2]   The shipping center keeps paperwork on its customers.

Sometime in January 2005, DeFrancesco visited the Owings Mills store as part of his rounds. Bandurchin approached him and pointed out a Best Buy package that the men had left to be shipped. Again, DeFrancesco was unconcerned.

Around the time of DeFrancesco's visit, Reed Ringham replaced Bernardo as General Manager of the Owings Mills store. Bandurchin informed Ringham of her suspicions. Ringham told Bandurchin to keep an eye on the situation and to let him know of "any further action." On deposition, Bandurchin recalled that she also relayed her suspicions to Bryan Clark, a Sales Manager, and Lucinda Librin, another manager. They, too, instructed her to monitor the situation. None of the managers authorized her to contact the police.

Bandurchin's husband is a police officer for the Baltimore County Police Department. On January 5, 2005, Bandurchin, dissatisfied that "something was going on, and nobody seemed to be doing anything about it," shared her suspicions with him. She gave her husband the name, address, and phone number of one of the men, whom the Court will refer to as CL.[3] Officer Bandurchin wrote this information into a formal report, which states, "[e]nclosed is all of the information I could obtain, including copies of everything the two have sent out including to where and to who."

Officer Bandurchin referred the case to Detective Steve Pryor. Pryor called Bandurchin, and she told him about the regular shipments of high-end electronics. She

---

[3] To maintain his anonymity, the Court will refer to the man whom Bandurchin reported as CL. Bandurchin also provided her husband with CL's license plate number, and the color and make of his automobile.

4

also provided him with "printouts" that contained a name of the shipper, a description of the product, the tracking number, and the declared value of the shipped items.[4]

At some point after she contacted the police, Bandurchin called the Timonium Best Buy store about the packages. On deposition, Bandurchin explained that she wanted to learn the significance of the fluorescent sticker that was on one of the packages. She spoke with Chris Smith, a member of the Best Buy receiving department. She told Smith, "[b]asically the same thing I told everybody else; I have these two guys come in all the time shipping these high-end electronics multiple times a week." She did not provide Smith with the men's names. She did not provide Smith with any documents. Smith told Bandurchin that "they would research the product on their end to see where it had come from."

In April 2005, Bandurchin heard a rumor that CL had complained to Staples about her.[5] She asked Lynn Shibley, a Human Resource representative, to find out whether the rumor was true. In the course of this discussion, Bandurchin informed Shibley that she had reported her suspicions to the police.

Shortly thereafter, Staples held a conference call to discuss the specifics of Bandurchin's disclosures to the police. The following persons participated: Rebecca Ward, Staples's Regional Human Resources Manager, Rosalind Yawn, a District Manager, Ringham, DeFrancesco, and Bandurchin. During the call, Bandurchin recounted her disclosures to the police and to Best Buy.

---

[4]  Bandurchin cannot recall whether she volunteered the information to Pryor or whether he asked her for it.

[5]  On deposition, Bandurchin testified that she had heard that CL had accused her of "harassment or racism."

On May 17, 2005, Staples terminated Bandurchin. The notice of termination states:

> It was recently discovered that Jennifer released customer information without proper prior approval to persons outside of the Company. This action is in violation of our Ethics Policy as well as the Proprietary and Confidential [sic] Agreement. As a result Jennifer's employment with Staples is being terminated effective immediately.

On February 22, 2006, Bandurchin filed a wrongful termination suit in the Circuit Court for Baltimore County. On March 30, 2006, Staples removed the action to federal court on diversity grounds. On October 26, 2006, Bandurchin moved for partial summary judgment on the issue of liability. On November 27, 2006, Staples moved for summary judgment.

### III.  STANDARD OF REVIEW

The Court may grant summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); see also Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1128 (4th Cir. 1987) (recognizing that trial judges have "an affirmative obligation" to prevent factually unsupported claims and defenses from proceeding to trial). Nevertheless, in determining whether there is a genuine issue of material fact, the Court views the facts, and all reasonable inferences to be drawn from them, in the light most favorable to the non-moving party. Pulliam Inv. Co. v. Cameo Properties, 810 F.2d 1282, 1286 (4th Cir. 1987).

When both parties file motions for summary judgment the Court applies this same standard of review. See McCready v. Standard Ins. Co., 417 F. Supp. 2d 684, 695 (D. Md. 2006) (citing Taft Broad. Co. v. United States, 929 F.2d 240, 248 (6th Cir.1991)). The Court considers each motion "separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir. 2003).

IV.   **APPLICABLE LAW**

   A.   **At-Will Employment:**

Staples asserts, and Bandurchin does not dispute, that her employment at Staples was at-will. An at-will employee is terminable for any reason, Adler v. Am. Standard Corp., 291 Md. 31, 432 A.2d 464 (1981), "even a reason that is arbitrary, capricious, or fundamentally unfair." Towson Univ. v. Conte, 384 Md. 68, 82, 862 A.2d 941, 949 (2004) (citing Porterfield v. Mascari II, Inc., 374 Md. 402, 422, 823 A.2d 590, 602 (2003)).

   B.   **Wrongful Termination**:

The Maryland Legislature and Maryland courts have created exceptions to the general rule that the at-will employee may be terminated for "any reason, or no reason at all." Miller v. U.S. Foodservice, Inc., 405 F. Supp. 2d 607, 610 (D. Md. 2005) (citing Adler, 432 A.2d at 467); Mascari II, 823 A.2d at 602 (listing exceptions). These exceptions create a cause of action if the grounds for the discharge violate a clear mandate of Maryland's public policy.[6] Mascari II, 823 A.2d at 602.

---

[6]   In order for a mandate of public policy to be sufficiently established to support a wrongful discharge claim, "there must be a preexisting, unambiguous, and particularized

7

The elements of a wrongful discharge claim are: (i) the employee was discharged, (ii) the basis for the employee discharge must violate some clear mandate of public policy, and (iii) there is a nexus between the employee's conduct and the employer's decision to fire the employee. Miller, 405 F. Supp. 2d at 610 (citing Wholey v. Sears Roebuck, 370 Md. 38, 803 A.2d 482, 489 (2002)).

### C. Wholey v. Sears Roebuck:

In Wholey, the Maryland Court of Appeals held that an employee who is fired for reporting suspected crimes to the proper authorities may bring a wrongful termination claim. 803 A.2d at 495. The Court of Appeals held that an employer violates a clear mandate of Maryland public policy when it fires an employee for reporting a suspected crime. Id. at 494. The Wholey Court found that Maryland had established a clear mandate of public policy through Maryland Code Art. 27, § 762, which makes it a misdemeanor for a person to harm or injure another's person or property in retaliation for reporting a crime, and Art. 27, § 760, which defines "witness" as one who "has reported a crime or delinquent act to a law enforcement officer, prosecutor, intake officer, correctional officer, or judicial officer." Id.

From these provisions, the Wholey Court concluded that "the Legislature sought to protect those witnesses *who report suspected criminal activity to the appropriate law enforcement or judicial authority* from being harmed for performing this important public

---

pronouncement, by constitution, enactment or prior judicial decision, directing, prohibiting, or protecting the conduct in question so as to make the Maryland public policy on the topic not a matter of conjecture or even interpretation." King v. Marriott Int'l, Inc., 160 Md. App. 689, 702, 866 A.2d 895, 903 (2005). The purpose of this limitation is to "limit[ ] judicial forays into the wilderness of discerning 'public policy' without clear direction from a legislature or regulatory source." Id. (citing Milton v. IIT Research, 138 F.3d 519, 523 (4th Cir. 1998)).

8

task." Id. at 494.  The Court, therefore, adopted a wrongful discharge cause of action for employees who are terminated for reporting suspected criminal activity to the appropriate authorities.  Id.  The plaintiff in Wholey, a Sears security guard, brought a wrongful discharge claim after Sears fired him for installing cameras to monitor the suspected criminal activities of a store manager. Id. at 486.  The Court concluded that the exception did not apply to Wholey, because he made his allegations to supervisors and co-workers, not a law enforcement agency.[7]

Both parties contend that Wholey governs the outcome of this case.  As stated below, this case presents two issues undecided by Wholey.  First, whether an employer may terminate without liability an employee who violates company policies (e.g., requiring protection of confidential customer information) when she reports suspicious activity to the authorities.   Second, whether an employer may fire an employee who reported a suspected crime both to a law enforcement agency and to an outside company.

---

[7] In Wholey, the Court of Appeals acknowledged that protecting external reports but not internal reports might create an adverse incentive for employees.  The Wholey Court stated that employees might report suspicious activities to the police before informing their supervisors. 803 A.2d at 496 n.15.  This incentive, in turn, would "deprive management of the opportunity to correct oversights straightway…or clear up a misunderstanding on the part of the whistleblower."  Id.  The Wholey Court, however, refused "to create a public policy grounded only in mere supposition about the employer/employee relationship."  Id.  This Court must therefore apply the rule as stated in Wholey in spite of this potential problem.

**V.      ANALYSIS**

According to Staples, it terminated Bandurchin because she violated company policies by releasing customer information to "persons outside the company."[8] Those persons were Officer Bandurchin and Detective Pryor of the Baltimore County Police and Chris Smith of Best Buy.   The court will analyze the disclosures to each person in turn.

**A.      Disclosures to Police**:

Neither party disputes that Bandurchin reported CL's suspicious activity to the police (first to her husband, then to Detective Pryor), and that she turned over CL's name, address, phone number, information about his automobile, and "printouts" describing his shipping history.  Staples contends that Wholey does not apply to this report for two reasons.  First, it argues that Wholey does not extend to situations in which an employee reports a suspected crime to the police but has violated company policy in doing so. Second, it argues that that Wholey does not protect "false accusations" and that Bandurchin's accusation was "false" because she cannot prove that her report resulted in a prosecution.  Both of these arguments fail.

First, Staples contends that it did not terminate Bandurchin for reporting her suspicions to the police, but rather for the manner in which she did so.  According to Staples, Bandurchin violated Staples's policies when she disclosed customer information to the police without first obtaining authorization from Staples management.  It was the violation of company policy, not Bandurchin's report to the police that led to Bandurchin's termination, Staples alleges.

---

[8]     Similarly, Regional Manager Rosalind Yawn stated on deposition that Bandurchin was terminated for "giving personal customer documents to the police and to a retail store Best Buy."

Bandurchin's termination notice references Staples's "Ethics Policy" and its "Proprietary and Confidential Agreement." Staples refers to other polices that Bandurchin violated.[9] The Ethics Policy outlines ten "core expectations" for Staples employees. Most pertinent is the eighth expectation, entitled "respect customer privacy." It counsels employees to protect "personally-identifiable customer information," including "credit card information" and "buying history." The expectation states: "never disclose such information outside Staples or use it for anything other than legitimate company purposes."

The "Proprietary and Confidential Agreement" governs "Proprietary Information" defined as Staples's "information....which...ha[s] commercial value in the business," such as "trade secrets, marketing plans, customer lists, and other customer information." Employees must agree to keep that information "in confidence and trust, and not use it to the detriment of the Company or for the benefit of myself or any third party."

Staples's policies cannot be used to justify Bandurchin's termination, because in the context of this case, they conflict with the public policy stated in Wholey. The Wholey Court sought to prevent employers from hindering the "important public task" of reporting suspected crime. See Wholey, 803 A.2d at 494.[10] Requiring an

---

[9] The other policies are of diminishing relevance. For example, Staples cites the Employee Handbook, which states that "confidential information cannot be shared with others outside the company," but never defines what confidential information is in the first place. Staples also cites a document entitled "Handling Suspected Customer Theft," which instructs employees to contact their District Manager and the Loss Prevention Manager before calling the police, but the document is plainly geared towards thefts of Staples merchandise. At any rate, Staples does not allege that Bandurchin was ever provided with the document. Rather, it was only available on an internal website.

[10] See also U.S. Foodservice, 405 F. Supp. 2d. at 612-13 (refusing to restrict Wholey to situation where employee who reported his knowledge of a suspected crime was not

employee to obtain an employer's permission before contacting the authorities would hinder the reporting of crime. The same reasoning applies to a company policy that gives the employer veto power over the information provided. Thus, Staples could not terminate Bandurchin for incidentally violating these policies when she made her police report.

The Court recognizes that the reporting of crime raises legitimate concerns for a company. The report, especially if it is unfounded, may affect customer, client, and affiliate relationships and even subject the employer to liability. Hence, the Court perceives the wisdom in company protocols for reporting suspicious activity. The Maryland Court of Appeals may recognize an exception to Wholey if the protocol that the employee violated does not chill the reporting of crime to the police. Such a concern does not apply to the instant case.[11] Bandurchin reported her concerns to her supervisors, but they gave her no guidance.[12] Moreover, the Maryland Court of Appeals has not yet recognized to the Wholey rule for carefully crafted corporate protocols.

---

the same individual who initiated the criminal and regulatory investigation).; Adler, 432 A.2d at 469 ("[t]he foundation of the tort of retaliatory discharge lies in the protection of public policy, and there is a clear public policy favoring investigation and prosecution of criminal offenses." (internal citations omitted)).

[11]  Staples has a protocol for reporting suspected thefts *from Staples*, but both Bandurchin and Loss Prevention Manager DeFrancesco have explained that this policy does not apply to suspected thefts that do not involve Staples merchandise. Because Staples policies only address theft of Staples merchandise, they did not provide Bandurchin a path to pursue her suspicions. Thus, Staples' policy as it stands impermissibly deters its employees from reporting suspected crimes to the police.

[12]  Likewise, the Court rejects Staples's alternate argument, that Bandurchin could have gone to the police, but not provided any "confidential customer information." Staples has defined all of the information Bandurchin provided to police as "confidential customer information." Staples would have had Bandurchin report to the police her

Second, Staples argues that <u>Wholey</u> does not protect Bandurchin because there is no evidence that the State ever prosecuted CL for theft. <u>Wholey</u> held that "the protection afforded to those who report criminal activity would be eliminated should such report prove to be false *in accordance with Article 27 Section 150(a)*." <u>Wholey v. Sears Roebuck</u>, 370 Md. 38, 803 A.2d 482, 494, n.13 (2002) (emphasis added) (citing Md. Code Ann., Crim. Law, Art. 27 § 150(a)). The Maryland criminal statute cited in <u>Wholey</u> prohibits making a report "knowing the same…to be false." <u>Id.</u> Bandurchin's reports are only "false" under that definition if she knew they were untrue when she made them.[13]

Neither party has offered an explanation for the men's actions. It is unclear whether the parties could establish the true reason for the men's activities through further investigation. In any event, Staples does not contend that Bandurchin knew the men were innocent when she reported her suspicions. The rule in <u>Wholey</u>, therefore, protects her disclosures to the police, whether or not the men's actions were actually illegal.

Even though Staples's policies as applied to Bandurchin conflict with the public policy stated in <u>Wholey</u>, we do not grant summary judgment in her favor. As explained below, Bandurchin also disclosed customer information to Best Buy, a disclosure that <u>Wholey</u> does not protect. A genuine issue of fact remains as to Staples's actual reasons for firing Bandurchin.

---

observations without any facts. Again, the Court declines such a crabbed reading of <u>Wholey</u>.

[13]     This makes sense as a matter of public policy. An employee can never know for sure whether her suspicions will turn out to be accurate. A rule that only protects employees that report well-founded suspicions would chill the flow of information that <u>Wholey</u> sought to promote.

**B.      Disclosures to Best Buy:**

The undisputed facts show that Bandurchin told Best Buy employee Chris Smith, "Basically the same thing I told everybody else; I have these two guys come in all the time shipping these high-end electronics multiple times a week."

Staples contends that <u>Wholey</u> does not protect this disclosure of "two customers' shipping activities," providing an independent justification for Bandurchin's termination. The Court agrees that <u>Wholey</u> does not protect this disclosure. It only protects reports of suspected criminal activity to law enforcement or officers of the courts. <u>Wholey</u>, 803 A.2d at 496.

**C.      Causation:**

Staples fired Bandurchin for reporting either to the police or to both Best Buy and the police. This creates a genuine dispute of material fact concerning Staples's reason for terminating Bandurchin.  Hence, a jury trial is required to answer this question. Before the trial can be held, briefing is needed on the mixed-motives issue. The briefing schedule will be laid out in a separate order.  The briefs should address the following issues:

1)   There is case law discussing the mixed-motives issue in the context of employment discrimination. <u>See</u> <u>Williams v. Md. Dep't of Human Resources</u>, 136 Md. App. 153, 166, 764 A.2d 351, 358 (2000); <u>Killian v. Kinzer</u>, 123 Md. App. 60, 68-71, 716 A.2d 1071 (1998) (reversing circuit court for failing to use a mixed-motives analysis when employer gave mix of legitimate and illegitimate motives for termination); <u>Brandon v. Molesworth</u>, 104 Md. App. 167-98, 655 A.2d 1292 (1995) (applying a mixed-motives analysis to wrongful termination claim for sexual harassment), <u>aff'd in part and rev'd in part on other grounds</u>, 341 Md. 621, 672 A.2d 608 (1996).  Are these cases pertinent?

2)   How should the burden of proof be divided?

    3)       Must the employer establish that it would have terminated the employee on the permissible ground alone?

    4)       Assume that the employer terminated an employee for an impermissible reason.  Assume also that an independent permissible ground existed.  Do counsel agree that the employer may not retroactively justify the termination on the permitted ground?

## VI.  CONCLUSION

For the reasons stated, and by separate order, the Court will DENY the motions. In a separate order, the Court will schedule further briefing on the mixed-motives issue and schedule status teleconference.

Dated this 28th day of September, 2007.

                                                      _____/s/_____
                                                      Benson Everett Legg
                                                      Chief Judge